Filed 1/7/26  P. v. Valdez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E082838 |
| v. | (Super.Ct.No. FWV22003716) |
| MARIO N. VALDEZ, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Joseph B. Widman, Judge.  Affirmed.

Belinda Escobosa, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Mario N. Valdez of a felony domestic violence offense against Jane Doe and misdemeanor child endangerment against Mary Doe. (Pen. Code, §§ 273a, subd. (b), 273.5, subd. (a).) Valdez argues that the trial court erred by admitting evidence of uncharged domestic violence under Evidence Code sections 1101 and 1109. (Unlabeled statutory references are to this code.) We affirm.

BACKGROUND

I.    *Evidence regarding charged offenses*

Jane and her late husband had several children together, including Mary. Jane and Valdez started dating in October 2021, after her late husband died in 2019. She and her children lived with Elsie K., who is the children's paternal grandmother (Grandmother). Valdez moved in with the family around November 2021. During the first month or two that he lived there, Grandmother thought that Valdez seemed very nice, and he was good with the children. But things changed after the first few months.

The events underlying Valdez's conviction occurred in April 2022. Eight-year-old Mary ran into Grandmother's room crying and said that Valdez was attacking Jane. Jane and Valdez came out of their room and were arguing; he was cursing at her, calling her a "bitch," and threatening her. He accused her of "messing around with somebody." He then grabbed Jane's throat, pushed her against Grandmother's bedroom door, and choked her. Grandmother could hear Jane gasping for air. Valdez suddenly let Jane go, and she fell to the ground, coughing and still gasping for air.

2

Grandmother tried to leave to pick up Jane's son from school, but Valdez blocked Grandmother from leaving. She told him that she was going to call the police if he did not let her leave. She started to dial 911, and he pointed at her and said, "[W]atch it. I'm getting the Mongols after you."

Dispatch answered the call, and Valdez fled. The People played Grandmother's 911 call for the jury. She was on the line with 911 as she drove to her grandson's school, and Mary was with her. Grandmother reported that Valdez pushed Jane against the door and choked her, and Mary confirmed that he choked Jane. Grandmother told the dispatcher that Valdez knew "the Mongols" and threatened to "get them after" her. Mary said that Valdez threatened to have the Mongols kill Grandmother if she called the police. Mary also said that Valdez was threatening to call "CPS" and get her taken away. Grandmother told the dispatcher: "They didn't want me to call because he, they don't want him to go to jail or whatever, but I'm tired of this." She said that Valdez had them all "scared to death every day."

Officers also spoke to Mary in person. During that recorded conversation, Mary reported that Valdez pulled her mother's hair and choked her mother. The officer asked if Mary saw Valdez choke her mother, and she replied: "Yes. And he, he has a, he has a knife on the side that's not like a real knife, but it looks like a knife." She again stated that he threatened to call "CPS" and have her taken away, and she confirmed that Valdez "knows Mongols."

3

Officers responded to the home and spoke to Jane, and a recording of Jane's conversation with the officers was played for the jury. Jane told the officers that Valdez got angry, grabbed her, and pushed her, but she denied that he choked her. One officer observed that she had redness on her neck. The other officer noted that she put her hand to her neck when she described Valdez pushing her, and the officer said: "When you're getting C-clamped like that. Yeah. That's considered to be choking." Jane replied: "Okay." She said that Valdez had choked her only once, and "it wasn't a problem." They got into an argument over something her daughter said, and then Grandmother became involved and started yelling at him. He choked Jane for roughly three seconds, but she pulled his arm off. They had a physical fight one other time when Jane "socked him first." Jane insisted that everything was "okay," he would not do it again, and she would handle it. She loved Valdez and did not want him to go to jail.

Jane and Valdez married in May 2023, and his trial took place in June and July 2023. Jane testified that she and Grandmother did not have a good relationship during Jane's marriage to her late husband, and the relationship between the two women only worsened after her late husband's death. Grandmother did not approve of Jane's relationship with Valdez. Jane testified that Grandmother called 911 because Grandmother was jealous; Jane and the children were "finally becoming happy," and Mary had started calling Valdez "daddy." Grandmother was arguing with Jane and saying things like, "I just want our life back. I want to ruin your life. Why are you happy?" Jane and Valdez had a "slight argument" that day about Grandmother. Jane put

4

her arm on him, and he "nudged" her off, but that was the extent of their physical contact. He did not choke her, and he did not hurt her.

Jane denied telling the responding officers that Valdez grabbed her neck, choked her, or pushed her, and she denied demonstrating how he grabbed her neck. She also denied saying that she had hit him during another incident. Jane said that she was testifying to support Valdez and that he did not do anything. She and her children loved him. She said that the redness on her neck was "a hickey," and she gave herself other red marks on her face by scrubbing her face too hard.

Mary, who was then nine years old, also testified at trial. She referred to Valdez as her dad. Mary said that when Grandmother called 911, they were "having a good day," and Grandmother "just got mad that [Jane] wanted to be happy." Valdez was not arguing or fighting with anyone when Grandmother called the police. But Grandmother was arguing with Jane because Grandmother did not want Mary calling Valdez "dad." Valdez did not hit Jane or choke her.

Mary denied saying anything on the 911 call; she said that she was with Grandmother but stayed quiet. She also denied telling the responding officers that Valdez pulled Jane's hair and choked Jane or that he threatened to call "CPS." Mary said that Grandmother told her to say bad things about Valdez and told her to lie. She was sad that Valdez was on trial, because he did not do anything. She loved and missed Valdez and wanted him to come home.

5

At trial, the People played several recorded jailhouse calls between Jane and Valdez. In one call, both of Jane's children were on the phone, and he told them to "make sure mom's up early in the morning so you guys could go to court tomorrow to let them know that all that shit was a lie. That old lady said." In another call, Valdez repeatedly scolded Jane for texting during his court appearance. He told her: "I need you to do something. Cause if your ass is gonna leave me in here to rot, you guys could go over your own way." He also repeatedly threatened to end their relationship, saying things like, "I'm done trying," and "I'll stop loving you guys." At another point, he told her: "It's over. I ain't gonna make a hoe a housewife." Jane told him numerous times that she loved him and pleaded with him not to end their relationship. Valdez said, "You ain't doing shit I asked you to do," and called her a "fucking weak-minded ass." He also accused her of being with another man and stated: "Fucking sitting there texting him right in front of me. Bitch, I ain't stupid."

II.     *Evidence regarding uncharged conduct*

Grandmother testified about an uncharged incident between Jane and Valdez that occurred in February 2022. Mary came into Grandmother's room crying and said that she was afraid Jane was going to be killed. Mary told Grandmother that she saw Valdez hitting her mother. Grandmother met Jane in the hallway, and one side of Jane's face was starting to swell. Jane said that Valdez hit her "out of reaction." Jane told Grandmother that it was an accident and asked her not to call the police. Valdez came out of the room and looked upset. He was arguing with Jane and cursing, and he accused

6

her of "messing around with someone else." He pushed Jane against the closet door in Grandmother's room and also against the hallway wall. He threatened to have the Mongols go after the children if they reported him. Grandmother did not call the police after the incident, because Jane convinced her that it was an accident.

Grandmother first reported the February 2022 incident to the prosecutor the day before she testified about it. She told the prosecutor that Valdez pushed Jane once (in Grandmother's bedroom), not twice (in Grandmother's bedroom and the hallway). She did not recall the second push when the prosecutor interviewed her, even though she recounted the incident multiple times during the interview. At trial, Grandmother remembered that Valdez pushed Jane twice, because her memory of the event was "coming back" as she testified.

Valdez's ex-wife, Rosie J., also testified about Valdez's violence against her. They were in a relationship from December 2017 to January 2019. The incident occurred in January 2019, when Rosie was three months pregnant. The two of them were arguing one afternoon, and Valdez left her at a fast food restaurant. When he got home that night, he came into her room smelling of alcohol. Rosie's teenage daughter and eight-month-old daughter were also in the room. Rosie said that she was going to call Valdez's family to pick him up, and he got upset and grabbed her phone. He was cursing at Rosie, belittling her, and calling her names like "bitch." Rosie was scared that Valdez was going to harm her, because he had pulled her hair on a prior occasion. The teenage daughter yelled at him to stop, and Valdez pushed the teenager, who was holding the

7

baby daughter. Rosie told him not to touch her daughter. Valdez pushed Rosie down onto the bed, got on top of her, kneed her in the stomach, and pushed her head into the pillow. Rosie struggled, and they fell to the floor. She saw her phone on the floor and threw it to her teenage daughter, whom she told to run and call 911.

The teenage daughter ran and yelled for Rosie's son, who was also a teenager. Her son got Valdez off Rosie, and he and Valdez started fighting. She saw that Valdez had a pocket knife, and she tried to break up the fight until her son freed himself and told her to run. Valdez caught up to her in the hallway, grabbed her by the neck with both hands, and pushed her against the wall. He was squeezing her neck, and she could not breathe. Her stomach felt bruised. Her son tackled Valdez, they started fighting again, and Rosie tried to run. But Valdez grabbed her once again and got on top of her. He pushed his knee into her stomach, "pulled [her] hair down," and banged her head against the tile floor several times. She could not see much, because blood from Valdez's face was dripping onto her face. After what "seemed like forever," Valdez said, "okay, okay," got off her, and calmly left. Rosie had bumps and bruises on her head, other bruises on her body, and an arm injury. She had to wear an arm brace for six weeks.

At the end of Rosie's testimony, the prosecutor noted that she was crying, and he asked her to explain why. She replied that reliving the episode was making her afraid and nervous; she did not want to be around Valdez, and she wanted to be done testifying so that she did not have to remember the episode.

Rosie's son also testified and described the episode similarly. He pulled Valdez off Rosie, and the son and Valdez fell to the floor and started "swinging" at each other. At some point, Valdez pulled out a small pocket knife. The son pinned Valdez's arm down and forced him to drop the knife. Valdez said that he was "done," and the son let him get up. Rosie walked into the hallway, and Valdez grabbed her throat with both hands and pushed her against the wall. The son tackled Valdez, who fell to the floor and pulled Rosie with him. Valdez got on top of Rosie, grabbed her hair with both hands, and banged her head against the tile floor multiple times. The son hit Valdez in the face until his hands "went numb," trying to get him off Rosie. Valdez was cursing at Rosie and calling her names like "big ho" and "slut." Valdez eventually said, "all right," released Rosie, and walked out of the house.

III.    *Conviction and sentencing*

The jury found Valdez guilty of (1) inflicting corporal injury on a cohabitant, resulting in a traumatic condition, and (2) misdemeanor child endangerment. (Pen. Code, §§ 273.5, subd. (a), 273a, subd. (b).) After a bench trial, the court found that Valdez had one prior strike, and it found true a number of aggravating circumstances. (Pen. Code, §§ 667, subds. (b)-(i), 1170, subd. (b)(2), 1170.12, subds. (a)-(d).) The court sentenced Valdez to four years in prison, consisting of double the two-year low term for the domestic violence count, plus a concurrent term of one year for the child endangerment count.

9

DISCUSSION

Valdez argues that the trial court erred by admitting evidence of uncharged domestic violence incidents. He contends that their probative value was substantially outweighed by the danger of undue prejudice. We disagree.

I.      *Relevant proceedings*

The People moved in limine to admit evidence of the January 2019 incident between Valdez and Rosie, arguing that the evidence was admissible under sections 1101 and 1109. Their brief stated that during an argument with Rosie, Valdez strangled her, hit her, pulled her hair, and brandished a knife. The brief also explained that Rosie's son and daughter witnessed the incident, and her son intervened.

The court granted the People's motion and ruled that the evidence was admissible under sections 1101 and 1109. The court observed that the incident was close in time to the charged conduct and involved a "very similar scenario." The court stated that it had conducted a section 352 analysis, and the probative value of the evidence outweighed the risk of undue prejudice. In addition, the court acknowledged that the evidence would "take some time," but the probative value also justified the consumption of time. Valdez was convicted for his attack on Rosie, and defense counsel asked the court to exclude the fact of his conviction. The court granted that request.

During trial, Valdez moved to exclude Rosie's testimony that he had pulled her hair on some unspecified occasion before the January 2019 incident. Defense counsel argued that the evidence was "too prejudicial" and "essentially a throwaway line,"

10

because there was no other evidence corroborating it. The court denied the motion to exclude, ruling that the evidence was admissible under section 1109 and that the probative value outweighed any risk of undue prejudice.

Valdez also moved during trial to exclude Grandmother's statements about the uncharged February 2022 incident between Jane and Valdez. Defense counsel argued that the evidence was more prejudicial than probative, because no other witness corroborated Grandmother's statements. The court again ruled the evidence was admissible under section 1109, noting that the charged and uncharged incidents involved the same victim, location, and time period. The court noted that the evidence was "subject to 352 balancing" and that it was not unduly prejudicial.

II. *Admission of evidence of prior domestic violence incidents*

"'[E]vidence of a person's character' is generally inadmissible 'when offered to prove his or her conduct on a specified occasion.'" (*People v. Baker* (2021) 10 Cal.5th 1044, 1088, quoting § 1101, subd. (a).) Section 1109 is an exception to that general rule. (*Baker*, at p. 1089.) The statute permits the admission of "certain evidence that a defendant accused of an offense involving domestic violence has committed other domestic violence." (*Ibid.*) Specifically, the statute provides: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a)(1).) According to the legislative history, the "'propensity inference is particularly

11

appropriate in the area of domestic violence,'" because "'on-going violence and abuse is the norm in domestic violence cases.'" (*People v. Johnson* (2000) 77 Cal.App.4th 410, 419.)

Section 352 states that a "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "'The "prejudice" referred to in [section 352] applies to evidence which uniquely tends to evoke an emotional bias against [the] defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."'" (*People v. Bolin* (1998) 18 Cal.4th 297, 320.)

In determining whether to admit evidence of prior conduct under section 1109, the trial court "should be guided by such factors as the 'nature, relevance, and possible remoteness' of the evidence, 'the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other . . . offenses, or excluding irrelevant though inflammatory details surrounding the offense.'" (*People v. Dworak* (2021) 11 Cal.5th 881, 900 (*Dworak*).)

We review for abuse of discretion the court's ruling on the admission of propensity evidence under sections 1109 and 352. (*Dworak*, *supra*, 11 Cal.5th at p. 900.) The court abuses its discretion if its ruling is """"arbitrary, capricious, or patently absurd.""" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1286.)

Valdez argues that the court erred by admitting evidence of the January 2019 domestic violence against Rosie, because the dissimilarities between the January 2019 incident and the charged incident "undermine[]" the probative value of the evidence. But the incidents shared enough similarities to make the evidence highly probative. In both instances, Valdez attacked a romantic partner in front of her children, held her against a wall or door, and choked her. There was evidence that he also pulled the victims' hair and had a knife in both cases. And in both cases, the evidence showed that Valdez cursed at the victim and called her names like "bitch." The "common factors" in the incidents rendered the "evidence of past domestic violence . . . particularly probative of the likelihood to repeat such behavior." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 533.)

Valdez further contends that the "inflammatory nature" of the January 2019 evidence rendered it unduly prejudicial and subject to exclusion. He argues that the evidence showed the attack on Rosie was more brutal than the attack on Jane. He also asserts that the jurors did not know whether he was convicted or punished for the attack on Rosie, so they might have been inclined to punish him for that prior incident.

First, to the extent that Valdez is arguing that the court erred by excluding evidence of his prior conviction, he invited that claimed error and cannot complain of it now.  (See *People v. Russell* (2010) 50 Cal.4th 1228, 1250 ["the doctrine of invited error applies when a defendant, for tactical reasons, makes a request acceded to by the trial court and claims on appeal that the court erred in granting the request"].)

Second, even if the attack on Rosie was more serious and prolonged than the attack on Jane, we cannot say that the court erred.  As already explained, the evidence was highly probative because of the similarities between the incidents.  In addition, "the probative value of 'other crimes' evidence is increased by . . . the close proximity in time of the offenses" and "the independent sources of evidence (the victims) in each offense." (*People v. Falsetta* (1999) 21 Cal.4th 903, 917.)  The January 2019 incident was not remote—it happened only three years before the charged offense—and Rosie and her son were independent sources who had nothing to do with the victims or witnesses of the charged offense.  Moreover, the probative value was increased by Jane's and Mary's recantations of their prior statements at trial and their insistence that Valdez had not attacked Jane at all.  The evidence of the January 2019 incident thus was particularly relevant to show that Valdez had a propensity to commit violence against his romantic partners and had done so in this case, despite what Jane and Mary said at trial.  The court acted well within its discretion by concluding that the danger of undue prejudice did not

substantially outweigh the probative value of the evidence.**1** (See *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 826 [although the uncharged incident "differed in certain respects from" the charged incident "and involved some details likely to have a particular impact on the jurors," the court did not abuse its discretion by admitting the evidence].)

Valdez further argues that the court erred by admitting evidence that he pulled Rosie's hair on some unspecified date before January 2019. The argument lacks merit. Rosie's testimony about the prior incident had probative value as propensity evidence because it was similar to the charged incident—both incidents involved Valdez pulling his partner's hair. And although Rosie did not specify when the prior hair-pulling incident occurred, it would not have been remote. Valdez and Rosie were together from December 2017 to January 2019, so the prior incident happened at most four years before the charged offense. Valdez contends that the evidence would have evoked an emotional bias against him, creating a high risk of undue prejudice. But he does not explain why the evidence uniquely tended to evoke an emotional bias. Rosie's testimony about the prior incident was very brief—it consisted of one sentence. The evidence was also far less inflammatory than the evidence of the charged offense, and it therefore was not likely to evoke any more emotional bias than the charged offense. The evidence appears to have been damaging to Valdez only in the sense that it tended to prove his guilt of the

---

**1** We do not address Valdez's argument that the court erred by admitting evidence of the January 2019 incident under section 1101, subdivision (b), given that the evidence was admissible under section 1109.

15

charged offense. But that is not the type of prejudice that "'section 352 was designed to avoid.'" (*People v. Barrett* (2025) 17 Cal.5th 897, 954.)

Lastly, Valdez argues that the court erred with respect to Grandmother's testimony about the February 2022 uncharged incident. The argument fails. The probative value of the evidence was particularly high because of the striking similarities between the February 2022 incident and the charged offense. In both incidents, Mary came to Grandmother crying because she saw Valdez attacking her mother. In both incidents, Valdez accused Jane of cheating on him and cursed at her. And in both incidents, he pushed Jane against a wall or door and threatened family members with retaliation by the Mongols. Moreover, the February 2022 incident occurred only a few months before the charged incident, so its extremely close proximity in time increased the probative value of the evidence.

Valdez does not explain why the February 2022 evidence created a substantial danger of undue prejudice, and we do not see any such danger. The evidence was no more inflammatory than the evidence of the charged offense. Instead, Valdez attempts to diminish the probative value of the evidence by arguing that (1) no other evidence corroborated Grandmother's account of the incident, and (2) Grandmother was an unreliable witness, given that her trial testimony differed materially from her statements to the prosecutor during the interview about the incident. But the fact that the probative value of the evidence could have been higher does not mean that the court abused its

16

discretion, particularly when Valdez does not identify any undue prejudice on the other side of the ledger.

For all of these reasons, the trial court did not abuse its discretion by concluding that the risk of undue prejudice did not substantially outweigh the probative value of the uncharged domestic violence evidence.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ

J.

We concur:

McKINSTER

       Acting P. J.

FIELDS

       J.